UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

SAMUEL LYNN FORD )
)
V. ) NO. 2:12-CV-225
)
CAROLYN L. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation with respect to the Motions for Summary Judgment [Docs. 10 and 12] of the plaintiff and the defendant Commissioner. This is an action for judicial review of the Commissioner's final decision which denied the plaintiff's application for disability insurance benefits following an administrative hearing before an Administrative Law Judge ["ALJ"].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff's medical history is summarized in his brief as follows:

> Plaintiff was treated at East Tennessee State University (ETSU) Physicians and Associates on February 2, 2009 for complaints of anxiety with panic attacks and shoulder pain. Diagnoses were given of hypertension, anxiety, alcohol abuse, psoriasis, and left shoulder pain (Tr. 198). Plaintiff returned to this location on May 22, 2009 with continued complaints of anxiety and was given a prescription for Lexapro and continued on a previous prescription of Lorazepam (Tr. 195).
> On August 12, 2009, Plaintiff was seen at Indian Path Medical Center resulting from trauma to his back. Plaintiff had been attempting to move a friend's motorcycle when he lost control and was pinned between the bike and a wall (Tr. 175). Following further examination, Plaintiff was found to have a L5 compression fracture and lumbar degenerative disc disease (Tr. 176).
> On August 26, 2009 Plaintiff followed up with ETSU Physician, Dr. Mouna Abouamara, for continued back pain resulting from the aforementioned accident. Plaintiff reported being put on Morphine and Lortab for the back pain and was in a brace, but could not recall the name of the orthopedic doctor he had saw at Indian Path Medical Center (Tr. 193). Diagnoses were given of L5 compression fracture, alcohol abuse, and hypertension. He was given a prescription for Lortab and referred to Appalachian Orthopaedics (Tr. 193).
> Plaintiff was seen by Dr. Daniel Klinar at Appalachian Orthopaedic Associates on August 27, 2009 for the aforementioned L5 compression fracture. X-rays were performed and showed no change in the compression fracture. Plaintiff was instructed to continue to wear his back brace (Tr. 182). On September 24, 2009, he followed up with Dr. Klinar with continued complaints of pain and new symptoms of left leg tingling and numbness (Tr. 181). The impression was given as L5 compression fracture and radiculopathy of left lower extremity (Tr. 181). Plaintiff continued treatment with Dr. Klinar on October 26, 2009. He still complained of discomfort in his back and continued to wear the back brace. Plaintiff reported not being able to lift and that the numbness and tingling in his leg was better but not completely resolved (Tr. 214). Dr. Klinar opined to weaning out of the back brace and to try physical therapy (Tr. 214). On November 23, 2009, Plaintiff returned with continued complaints of tingling, a catch in his back and his legs giving out (Tr. 213). Diminished sensation subjectively along the lateral border

2

of the left calf was noted (Tr. 213).

On November 30, 2009, Plaintiff followed up for his anxiety with ETSU Physicians. He reported increased stress from losing his job, having no insurance, and having to pay out of pocket for his MRI charge (Tr. 191). Additionally, Plaintiff reported being unable to sleep at night. Dr. Abouamara prescribed blood pressure medicine and switched his anxiety medication to Xanax. The doctor also noted that Plaintiff is to come back in three months and is unable to afford to come back sooner. Plaintiff was given the phone number of the Friends in Need Clinic due to not having insurance (Tr. 191).

Plaintiff returned to Dr. Klinar at Appalachian Orthopaedic Associates on December 3, 2009 with continued symptoms of numbness and tingling in his leg with diminished sensation over the lateral border of the left calf, despite attending physical therapy (Tr. 212). On December 31, 2009, the symptoms were again reported and Plaintiff voiced the opinion that he did not think he was getting any better (Tr. 211). On February 9, 2010, Dr. Klinar, noted "At this point we've ran out of things to do" and decided to start weaning Plaintiff off Lortab (Tr. 210).

On March 2, 2010, Plaintiff followed up with ETSU Physicians, Dr. Abouamara for follow-up of hypertension. Plaintiff reported having a lot of back pain, which was described as severe, along with a flare up of psoriasis (Tr. 276). Past medical history was given as anxiety, alcohol abuse, hypertension, psoriasis, back injury and a history of left shoulder dislocation (Tr. 276). The left shoulder dislocation had previously been treated at Appalachian Orthopaedic Associates, Dr. John Raff, and was described as recurrent (Tr. 254). Plaintiff returned to ETSU Physicians, Dr. Abouamara, on June 4, 2010 with continued complaints of back pain and anxiety. The doctor strongly advised Plaintiff to see a counselor and noted "I think that the anxiety is the major issue in his medical problems" (Tr. 272). On July 16, 2010 Dr. Abouamara described Plaintiff as being very anxious and also in a lot of pain (Tr. 270). Plaintiff returned on July 23, 2010 for a middle ear infection and the doctor opined to this being related to psoriasis and strongly advised him to start going to Friends in Need, because of not having insurance, so he could see a specialist (Tr. 268). On September 3, 2010, Plaintiff again returned to this location following an emergency room visit for a fall (Tr. 265). Impression was given as a posterior rib fracture with increasing chest wall pain (Tr. 265).

Plaintiff returned to Appalachian Orthopaedic on September 8, 2010 with continued low back pain and left lower extremity tingling. This time he was evaluated by Dr. C. Glenn Trent. Plaintiff reported that any physical activity, that is the least bit strenuous, aggravates the pain and he must stop (Tr. 242). Dr. Trent gave the opinion of Plaintiff being disabled from any heavy occupation and that he might be able to perform sedentary work, but questioned whether his education would allow him to find such a job (Tr. 242).

In addition to the aforementioned medical treatment records, the file contains two Physical Residual Functional Capacity Assessments (PRFC), completed by state agency doctors, and a psychological consultative examination. The two PRFCs were completed on December 10, 2009 and March 24, 2010 (Tr. 201-209, 225-233). They both limit Plaintiff to occasionally lifting fifty pounds, frequently lifting twenty-five pounds, standing and/or walking six of eight hours, and sitting six of eight hours (Tr. 202, 226). Both of the doctors opine to Plaintiff's pain level improving and allowing for the aforementioned level of functioning within twelve months from the alleged onset date

3

of July 31, 2010 (Tr. 208, 232).

On December 20, 2010 Plaintiff was evaluated Dr. Steven Lawhon for a psychological consultative examination (Tr. 281-287). The evaluation procedure included clinical interview, mental status examination (MSE), records review, and test of memory malingering (TOMM). Dr. Lawhon noted in the mental status portion of this examination that Plaintiff's affect and mood was anxious and depressed (Tr. 282). On the test of memory malingering Plaintiff obtained a score of twenty-two on trial one and a score of forty-six on trial two, which resulted in no indications of malingering (Tr. 283). Dr. Lawhon diagnosed Plaintiff with depression and assigned a present global assessment of functioning score of fifty-eight (Tr. 283). Dr. Lawhon opined to moderate limits in the ability to sustain concentration and persistence and mild to moderate limits in work adaptation (Tr. 284). In the clinical summary, the doctor noted that Plaintiff appeared to be somewhat confused during the evaluation, displayed poor eye contact, and was obviously depressed (Tr. 284). Concluding this report is a medical source statement of ability to do work-related activities (mental) completed by Dr. Lawhon. Within the categories noted on this form, the doctor noted "none", defined at the beginning of the form as "Absent or minimal limitations", in all areas (Tr. 285-287).

[Doc. 11, pgs. 2-5].

After the ALJ's negative decision, the plaintiff's attorney submitted other medical evidence while the plaintiff's claim was pending before the Appeal's Council. This information is summarized as follows:

On November 1, 2010 Plaintiff returned to ETSU Physicians with continued complaints of low back pain. He reported working in his yard and experienced another flare up of lower back pain (Tr. 348). Plaintiff reported his psoriasis had gotten worse recently and requested to see a dermatologist, even though he did not have insurance, to see if he could try something that was not very expensive (Tr. 348). The doctor noted Plaintiff to be shaky and not able to walk straight because of back pain (Tr. 348).
Plaintiff was referred and evaluated by Dr. Stuart Leicht at ETSU Physicians on November 8, 2010 for the psoriasis. This doctor opined to Plaintiff having mild to moderate psoriasis and gave him a topical steroid to treat the condition. The doctor also noted two problems with treating the psoriasis, the continued alcohol use and lack of resources (Tr. 345).
Plaintiff again returned to ETSU Physicians on August 12, 2011 for follow-up (Tr. 304-308). He was noted to be using a cane to ambulate and inspection/palpation of joints, bones, and muscles were abnormal (Tr. 306). On October 7, 2011, Plaintiff returned to this location and was noted to have right shoulder pain secondary to injury and surgery by Dr. Klinar (Tr. 303). He was also noted to have back pain with decreased flexion and to be wheelchair bound (Tr. 300). Plaintiff was again evaluated at this office on October 21, 2011 for follow-up to a recent hospitalization for an electrolyte imbalance (Tr. 292). He was noted to be limping (Tr. 294). The assessment was given as hypokalemia, muscle weakness generalized, rhabdomyolysis, and shortness of breath

4

>    (Tr. 296).
>        On September 28, 2011 Plaintiff was seen by Dr. Joni Sago (Tr. 314). This doctor noted Plaintiff as having severe chronic plaque psoriasis and on Humira. Plaintiff reported having broken his shoulder and was found to have significant osteopenia (Tr. 314). He also reported being put on Humira hoping it would help with his arthritis. Dr. Sago decided to taper down the use of Humira and for Plaintiff to return in three months to see how he was doing on a lower dose, but noted that he may end up going back up on the dosage (Tr. 314).
>        On November 7, 2011, notes from ETSU Physicians document what appears to be a mix up in Plaintiff's medication prescription (Tr. 311). Plaintiff's pharmacy had called this office because of a prescription for Hydrocodone. Notes indicate that Plaintiff was to be getting this from Dr. Klinar and not through ETSU Physicians. Attempts to reach Plaintiff and the pharmacy were unsuccessful. On November 9, 2011 Ellen with Berry's Pharmacy returned the called to ETSU and informed them they had called the wrong office and should have called Dr. Klinar (Tr. 311). Plaintiff was sent a letter dated November 11, 2011 from ETSU Physicians discharging him from their practice for violation of their narcotic policy (Tr. 291, 310).

[Doc. 11, pgs. 6-7].

At the administrative hearing, the ALJ, after hearing the plaintiff's testimony, took the testimony of Ms. Donna Bardsley, a vocational expert ["VE"]. He asked her to assume that the plaintiff was restricted to light work in a job which would allow him to sit or stand at his option, and would not require repetitive bending or twisting. The ALJ further limited the plaintiff to simple routine jobs. When asked if there were jobs, Ms. Bardsley identified the positions of cashier with 300 in the region and 225,000 in the nation, information clerk with 250 in the region and 240,000 in the nation, order clerk with 175 in the region and 215,000 in the nation, ticket seller with 200 in the region and 295,000 in the nation, and hand packager with 150 in the region and 100,000 in the nation. When asked to identify jobs with the same requirements except requiring only sedentary exertion, Ms. Bardsley identified hand packagers, with 75 in the region and 55,000 in the nation, sorter with 100 in the region and 60,000 in the nation, assembler with 125 in the region and 110,000 in the nation, and inspector with 80 in the region and 105,000 in the nation. (Tr. 47-48).

5

On February 14, 2011, the ALJ issued his hearing decision in the plaintiff's case. He found that the plaintiff suffered from severe impairments of lumbar degenerative disc disease, L5 compression fracture, and anxiety/depression. (Tr. 22). He then discussed the plaintiff's medical records. He mentioned the September 8, 2010 treatment record of Dr. C. Glenn Trent, the plaintiff's treating orthopedist, noting that Dr. Trent observed that "The back pain prevents him from doing any heavy occupation."[1] He then mentioned that a September 21, 2010 treatment note from ETSU Physicians and Associates, who were treating the plaintiff for blood pressure and pain, indicated that "claimant was told by Dr. Trent that he should not lift more than 20 pounds." (Tr. 24).

The ALJ next concluded that the plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in the regulations. (Tr. 25).

The ALJ then found that the plaintiff had the residual functional capacity to perform light work as defined in the regulations, except for simple, routine jobs with a sit or stand option with no repetitive bending or twisting. (Tr. 26). He found that the plaintiff's complaints of pain and other symptoms were "not credible to the extent that they are inconsistent with the above residual functional capacity assessment." He gave "great weight (to) the opinion of Dr. Trent that the plaintiff could perform light physical exertion despite his back disorder." He rejected the State Agency consultants who had opined that the plaintiff could perform medium exertion. Because of the plaintiff's "report of actual

---

[1]The ALJ does not mention that in that same treatment note, Dr. Trent observed that "He might perform a sedentary occupation." (Tr. 242).

6

activities including doing household chores, washing dishes, going grocery shopping, (visiting) with friends, and caring for his own personal needs...," the ALJ found that "he/she is able to get about in a manner which is not significantly restricted."[2] Accordingly, he found that the plaintiff was not credible and that his subjective complaints were not "supported by the documentary evidence." He reiterated that the statement of Dr. Trent, recounted by plaintiff to another physician, supported the ALJ's finding that the plaintiff could work at the light exertional level. (Tr. 27).

The ALJ then discussed the testimony of the VE, who identified 1,075 regional jobs which the plaintiff could perform with the diminished range of light work RFC found by the ALJ, finding that to be consistent with the Dictionary of Occupational Titles. (Tr. 28). Accordingly, he found that the plaintiff was capable of performing substantial gainful activity and was not disabled. (Tr. 29).

Plaintiff avers that the ALJ erred in three main respects. First, he states that the ALJ did not "fully evaluate medical source opinions" of Dr. Trent and Dr. Lawhon. Second, he argues that the ALJ did not properly evaluate plaintiff's credibility. Finally, plaintiff asserts that the "ALJ did not consider all evidence," referring to the evidence submitted to the Appeals Council following the ALJ's hearing decision.

With respect to the first allegation, the ALJ properly considered the opinion of Dr. Lawhon, and the limitation in the RFC to simple, routine jobs adequately accommodates the

---

[2]The Court is somewhat disturbed by the ALJ referring to plaintiff as "he/she" in his hearing decision, even in the era of "cutting and pasting."

7

relatively benign restrictions noted in Dr. Lawhon's written report. (Tr. 281-284). Indeed, conspicuously absent in the report of plaintiff's session with Dr. Lawhon is any mention of plaintiff's alcohol consumption noted just three months earlier by Dr. Nunley in her treatment note (Tr. 264), in which plaintiff stated he was drinking 6 to 8 beers per day. Dr. Nunley advised the plaintiff of the need to decrease his beer intake by one beer per day per week until he was no longer drinking. How much of his mild to moderate limitations noted by Dr. Lawhon in his report which could have been attributed to this high rate of alcohol use is uncertain. However, in any event, the RFC and the hypothetical to the VE adequately account for these limitations.

The allegation regarding Dr. Trent's opinion is much more troublesome and serious. Obviously, it was the lynchpin of the ALJ's determination that the plaintiff was capable of a limited range of light work, as opposed to sedentary work. Dr. Trent clearly stated that the plaintiff "might perform a sedentary occupation." Although the issue of whether the plaintiff was, in fact, disabled is beyond Dr. Trent's expertise, Dr. Trent was obviously of the opinion that the plaintiff could obtain disability, saying "he should be able to get them." (Tr. 242). The sole statement from any source other than the non-examining State Agency doctors who were rejected by the ALJ was the third-hand comment by Dr. Nunley that plaintiff said that Dr. Trent said that he should not lift more than 20 pounds. This was only 13 days after the treatment note by Dr. Trent. Dr. Nunley herself offered no opinion regarding the plaintiff's physical capacity regarding weight that he could lift.

The Court believes that Dr. Trent's treatment note, signed by him on September 8, 2010, is clear evidence that the plaintiff was limited to "a sedentary occupation," and that

8

even this only "might" be the case. In the total absence of credible contradictory evidence, the September 21, 2010 statement of Dr. Nunley as to what plaintiff told her Dr. Trent told him, being mere *dicta* to the purpose of his visit to Dr. Nunley, simply does not constitute substantial evidence that the plaintiff can meet the lifting requirements of light work.

However, this does not end the discussion. The ALJ asked the VE a *second* hypothetical, which had the same restrictions, including the ability of the plaintiff to sit or stand "at his option," with lifting being limited to *sedentary* exertion. In response to that question, Ms. Bardsley identified 380 regional jobs and 333,000 national jobs which the plaintiff could perform at the sedentary level with his other restrictions. The Court requested the parties to brief the issue of whether this constituted a substantial number of jobs, and both counsel responded with well-written and informative briefs.

To meet the burden at Step Five of the sequential evaluation process, the Commissioner must show that "work exists in significant numbers in the national economy" which a particular plaintiff can perform. 20 C.F.R. § 404.1560(c) and 42 U.S.C. § 423(d)(1)(A). Normally, the issue of what constitutes a "significant number" is not an issue, except in cases such as this where the number is meager. The regulation speaks in terms of the "national economy." Another regulation, 20 C.F.R. § 404.1566(b) states in part that "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'" Accordingly, the number of jobs in the region where a plaintiff lives comes into play, and vocational experts routinely identify jobs both nationwide and in the region.

In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), the court stated that "[w]e know

9

that we cannot set forth one special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." The court then instructed lower courts to consider certain criteria in determining whether work exists in significant numbers, including "the level of claimant's disability, the reliability of the vocational expert's testimony, the reliability of the claimant's testimony, the distance claimant is capable of traveling to engage in the assigned work, the isolated nature of the jobs, the types and availability of such work...", etc. The court then stated that "[t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.*

This is a difficult task in any circumstance. Beyond obvious circumstances, such as a vocational expert identifying a number of jobs as a snow plow driver where the claimant lived in Florida, it is a difficult determination to make. That being said, this Court believes that a category of available jobs must approach the nonsensical to not be a "significant number" under the statute and regulations.

In *Hall* itself, the Sixth Circuit found that the district court erred in finding that 1,350 jobs in the local economy was not a significant number of jobs. In *Stewart v. Sullivan*, 1990 WL 75248 (6th Cir. 1990), the Sixth Circuit held that 125 regional jobs and 400,000 national jobs constituted a significant number of jobs. In *Bradley v. Comm. of Soc. Sec.*, 2002 WL 1611471, the Sixth Circuit held 1,150 regional and 170,000 national jobs satisfied the regulations. While there are contrary findings in other circuits, the Sixth Circuit has routinely upheld such numbers, based upon the facts of the cases. In a very similar case, this Magistrate Judge held that 265 regional and 155,000 national jobs identified by a VE

constituted a significant number of jobs.  *See, Kroeger v. Astrue* 2012 WL 3990794 (E.D. Tenn.)  This finding was adopted by the district judge.

The Court simply cannot distinguish the circumstances of the plaintiff in this case from those present in *Kroeger* and *Stewart, supra*.  It therefore finds that the jobs identified by the VE in this case of hand packagers, sorters, assemblers and inspectors exist in significant numbers in both the regional and national economies.

The last relevant issue to be considered is the plaintiff's allegation that the case should be remanded with respect to the medical evidence submitted to the Appeals Council.  The Appeals Council reviewed that evidence and found it "does not provide a basis for changing the Administrative Law Judge's decision."  (Tr. 2).  The Court has reviewed these records.  Largely, they deal with plaintiff's psoriasis, some neck pain, depression, hypertension and muscle weakness due to an electrolyte imbalance attributable to alcohol-induced rhabdomyloysis. (Tr. 291-357).  A remand under Sentence Six of 42 U.S.C. § is allowed only if the plaintiff shows that new evidence after the ALJ rendered his decision is new an material.  "Material evidence is evidence that would likely change the Commissioner's decision."  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).  These records were generated due to complaints properly analyzed by the ALJ, and do not tend to show that the ALJ erred in his findings during the applicable time period before he issued his decision.  They would not change his mind and are thus not material.

Substantial evidence exists that the plaintiff was capable of substantial gainful activity within the RFC found by the ALJ at the sedentary level.  The hypothetical to the VE was likewise supported at the sedentary level, and she identified a significant number of jobs

11

which the plaintiff could perform. It is therefore RECOMMENDED that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[3]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).